# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 12, 2023         Decided June 21, 2024

No. 22-7114

MATTHEW COUCH,
APPELLANT

v.

VERIZON COMMUNICATIONS INC., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02151)

———

*Eden P. Quainton* argued the cause and filed the briefs for appellant.

*Jean-Paul Jassy* argued the cause for appellees Verizon Communications, Inc. and Michael Isikoff. With him on the brief was *William T. Um*.

*Matthew E. Kelley* argued the cause for appellee National Public Radio, Inc. With him on the brief was *David J. Bodney*.

Before: PILLARD, WALKER and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: In 2016, a young man named Seth Rich was murdered in Washington, D.C. Although D.C. police have concluded Rich was the victim of a botched robbery, the crime was never solved. Some online commentators claimed the murder was a politically motivated hit orchestrated and covered up by the victim's own friends and family.

A few years later, an investigative journalist produced a podcast that discussed the murder and the conspiracy theories surrounding it. One of the online commentators named in the podcast sued the journalist and his publishers for defamation and other related torts.

The district court granted judgment to all defendants after finding that the online commentator failed to plausibly allege actual malice or verifiable facts that were defamatory. It also denied leave to file an amended complaint after concluding that the proposed amendments would not fix the deficient pleadings.

We affirm.

## I. Background

Matthew Couch is a self-described investigative journalist, blogger, and political commentator. He operates a news and opinion website called "The DC Patriot" and maintains active profiles on social media platforms such as X (formerly known as "Twitter"), Facebook, Instagram, and TikTok. He also labels himself "one of the foremost . . . independent

investigators seeking to uncover the truth of what happened to Seth Rich" — the victim of an unsolved murder.  JA 32.

Seth Rich worked for the Democratic National Committee during the 2016 presidential primaries.  On July 10, 2016, Rich was murdered near his home in Washington, D.C.  Shortly after the murder, some people publicly speculated that Rich was the victim of a politically motivated murder and cover-up.  One theory was that Rich leaked internal DNC emails showing that the DNC favored former Secretary of State Hillary Clinton over Senator Bernie Sanders, so Clinton ordered his assassination.

Matthew Couch contributed to that speculation.  He theorized that Rich might have been paid to "download[ ] DNC emails and transfer[ ] the emails and other data to Wikileaks."  JA 610.  He publicly accused Rich's brother of impeding the murder investigation and "helping cover things up."  JA 108.  And he claimed that Rich's friend, local bartender Joe Capone, was somehow involved in the murder.

In 2019, Yahoo! News and its chief investigative reporter, Michael Isikoff, launched a new podcast called *Conspiracyland*.  The first season of *Conspiracyland* focused on the Seth Rich murder and the conspiracy theories that spread following his death.  Two of the episodes — "Episode 6: 'Collateral damage'" and "Bonus Episode 5" — specifically discussed Couch and the role he played in disseminating theories about Rich's death.  Isikoff interviewed both Capone and Mark Mueller — one of Rich's neighbors — who both accused Couch of harassing them and blaming them for Rich's death.  At various points during the podcast, Isikoff and his guests labeled Couch a "conspiracy entrepreneur," "troll," "crankster," and "bully."  *Couch v. Verizon Communications, Inc.*, 2022 WL 3016755, at *2 (D.D.C. July 29, 2022).

After the final episode of *Conspiracyland*'s first season aired, Isikoff appeared on National Public Radio's *Fresh Air* program to discuss the podcast. During this interview, Isikoff summarized the podcast and generally repeated his claims that Couch spread conspiracy theories about Rich's murder and accused Capone and Mueller of helping with the cover-up.

In August 2020, Couch sued Isikoff, Verizon (the then-parent company of Yahoo! News), and NPR for defamation.[1] He also sued them for defamation per se, intentional infliction of emotional distress, false light, civil conspiracy for all alleged torts, aiding and abetting for all alleged torts, and intentional interference with business relations. And he sued Verizon and NPR for negligent supervision and retention of Isikoff and NPR's *Fresh Air* hosts.

Isikoff and Verizon jointly filed a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the case against them for failure to state a claim. The district court granted the motion and dismissed all claims directed against those two defendants. *Couch v. Verizon Communications, Inc.*, 2021 WL 4476698, at *1 (D.D.C. Sept. 30, 2021). The district court determined that Couch was a limited-purpose public figure, and so must show actual malice to sustain his defamation claim. *Id.* at *3 & n.7. It then concluded that Couch failed to

---

[1] Couch also sued Aaron Rich, Joe Capone, Mark Mueller, and Deborah Sines (a prosecutor who investigated Rich's murder and also appeared on *Conspiracyland*). However, Aaron Rich also sued Couch, prompting Couch to settle the claims against Rich and issue a public retraction and apology. Couch also voluntarily dismissed his claims against Mueller and Sines, and Capone never entered an appearance in the case.

plead any facts that could support actual malice, so both the defamation claim and all derivative claims failed. *Id.* at *4-6.

NPR moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings, based on the same arguments Isikoff and Verizon used in their motion to dismiss. *See Couch*, 2022 WL 3016755, at *1. Couch sought leave to file an amended complaint against Isikoff, Verizon, NPR, Yahoo! News, Apollo Global Management, Inc. (the new parent company of Yahoo! News), and a John Doe, LLP. *See id.* The district court granted NPR's motion for judgment on the pleadings, denied Couch's amended complaint as futile, and dismissed the case with prejudice. *See id.*

Couch appealed both orders.

## II. Couch's Defamation Claim Fails

Although Couch challenges both the dismissal of his claims against Isikoff and Verizon and the grant of judgment on the pleadings to NPR, he concedes that this appeal can be resolved solely by determining whether the district court erred when it denied leave to file an amended complaint.

When a district court denies leave to file an amended complaint for something like untimeliness or undue prejudice to the defendant, we review for abuse of discretion. *Atchinson v. District of Columbia*, 73 F.3d 418, 425-26 (D.C. Cir. 1996). But when a district court denies leave to amend because of futility, this means the district court examined the proposed amended complaint and concluded that even with the new factual allegations, the plaintiff still failed to state a valid claim. *See In re Interbank Funding Corp. Securities Litigation*, 629 F.3d 213, 218 (D.C. Cir. 2010). Our standard of review for such cases mirrors the standard by which we review a normal

dismissal under Rule 12(b)(6). That is, we look for whether the rejected amended complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Xia v. Tillerson*, 865 F.3d 643, 649-50 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And we review the district court's conclusions de novo. *Wang v. Blinken*, 3 F.4th 479, 481 (D.C. Cir. 2021).

### A. Couch's Defamation Claim Requires Actual Malice

This case turns on whether Couch sufficiently pleaded a defamation claim. For that, he needed to plausibly allege that the various defendants made false and defamatory statements, published those statements to a third party, acted with (at least) negligence, and thereby caused a special harm to Couch. *See Rosen v. American Israel Public Affairs Committee, Inc.*, 41 A.3d 1250, 1255-56 (D.C. 2012).

But even more than that is required here, because Couch conceded in the district court that he is a limited-purpose public figure. *Couch*, 2021 WL 4476698, at *3 & n.7. So proof that the defamatory statements were made negligently is no longer enough. A limited-purpose public figure must prove actual malice to win a defamation suit relating to the "particular public controversy" that made him a limited-purpose public figure. *Clyburn v. News World Communications, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990) (cleaned up).

We have called this actual malice standard "famously 'daunting.'" *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). It requires Couch to ultimately prove, by "clear and convincing evidence," that the allegedly defamatory statements were made with either actual "knowledge" that the statements were "false," or

"reckless disregard" of the statements' accuracy. *Jankovic v. International Crisis Group*, 822 F.3d 576, 589-90 (D.C. Cir. 2016) (cleaned up). Reckless disregard requires proof that at the time the statements were made, the defendants either had "a high degree of awareness of probable falsity" or "entertained serious doubts as to the truth of" their statements. *Tah*, 991 F.3d at 240 (cleaned up).

When evaluating both ways of proving actual malice, we look specifically to "the defendant's state of mind at the time of publication." *Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106, 118 (D.C. Cir. 2017). So a public figure must do more than prove that supposed defamatory statements were factually or objectively incorrect. He must prove that the defendants subjectively knew their statements were incorrect, or recklessly published their statements while subjectively knowing the likely falsity. *See id.* at 116.

Of course, at the motion-to-dismiss stage, we do not require Couch to do any more than plead sufficient facts to plausibly state his claim. But courts may still peer down the road towards a plaintiff's eventual evidentiary burden to deduce whether he plausibly alleged the types of facts that can, if proven, satisfy that burden. Couch must allege facts that, if proven, would show that the defendants either knew their statements were false, had high awareness that the statements were probably false, or had serious doubts about the accuracy of the statements.

He has not done so.[2]

---

[2] On appeal, Couch argues that the district court applied the wrong standard of review and faulted him for not fully proving "clear and convincing" evidence at the pleading stage. We disagree. The

## B. Couch Failed to Plead Actual Malice

Between his operative complaint and proposed amended complaint, Couch identifies fourteen supposed defamatory statements. The fourteen statements fall into two categories. The first category contains the eight statements where Isikoff allegedly accused Couch of implicating Capone and Mueller in Seth Rich's murder or accused Couch of harassment. In essence, these are statements where Isikoff reported that Couch said or did things that he claims he never said or did.[3]

As they appear in *Conspiracyland*, each of those eight statements consists of Isikoff either quoting Capone and Mueller word-for-word or accurately summarizing what Capone and Mueller said. Couch has not alleged the existence

district court simply copied the approach we took in *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231 (D.C. Cir. 2021), when it acknowledged that legal standards require a plaintiff to ultimately prove his case by clear and convincing evidence and then looked to see if the plaintiff plausibly alleged any facts that could, if proven, carry that burden, *id.* at 239-40, 243.

[3] Couch alleges that Isikoff said: (1) Couch accused Joe Capone of meeting with Hillary Clinton or her aides in the days before Seth Rich's murder; (2) Couch accused Joe Capone of plotting Seth Rich's assassination with Hillary Clinton or her aides; (3) Couch peddled the conspiracy theory "that Hillary Clinton murdered Seth Rich"; (4) Couch doxed Mueller "by publishing the addresses and phone numbers of his siblings and neighbors"; (5) Couch superimposed Mueller's face on pictures of real-life serial killer Jeffrey Dahmer and fictional serial killer Dexter Morgan; (6) Couch attempted to rent Mueller's basement AirBnB "to gain access to documents relating to Seth Rich"; (7) Couch harassed Mueller "by relentless phone calls and emails"; and (8) Couch claimed Capone and Mueller engaged "in a 'cover-up'" of the murder. JA 650.

of some smoking-gun evidence that would show Isikoff knew those statements were false. Nor has he offered specific allegations of why Isikoff might have had "obvious reasons to doubt the accuracy of" Capone and Mueller's accounts. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003).

Instead, Couch presents four theories of circumstantial evidence that he believes can support a finding of actual malice. We find none of these theories sufficient.

*First*, Couch claims that Isikoff possessed all of Couch's relevant tweets and knew that none of those tweets talked about Capone meeting with Clinton. So, in Couch's eyes, Isikoff had an "obvious" reason to doubt the accuracy of Capone's statement that Couch publicly spread the conspiracy theory about Capone meeting with Clinton, and therefore acted with reckless disregard when he republished Capone's statement anyways.

Isikoff indeed filed a motion, in connection with his Rule 12(b)(6) motion to dismiss, urging the court to take judicial notice of Couch's tweets from the relevant period. But that falls well short of proof that Isikoff acted with reckless disregard. For one thing, the *Conspiracyland* episodes were published in 2019. Isikoff's attorneys submitted the list of Couch's tweets in 2021. Isikoff's filing of a list of Couch's tweets two years after making the podcast offers no insight into whether he had reviewed all those tweets when making the podcast — and, by continuation, no insight into whether he had an obvious reason to doubt Capone's account. *See Lohrenz*, 350 F.3d at 1284.

For another thing, Couch maintained an active public presence on many different communication platforms. Even if Couch hadn't tweeted about Capone and Clinton, he could have

easily accused Capone of meeting with Clinton on any of his other platforms. So even if Isikoff had indeed reviewed all of Couch's tweets, that alone would not provide a reason to doubt Capone's claim.

*Second*, Couch argues that he caught Isikoff "fabricat[ing] out of whole cloth" two different statements about Couch accusing Capone of conspiring with Clinton. Couch Br. 17. A fabricated quotation can be strong evidence of actual malice. But fabricated quotations require some clear indication that the speaker intended to attribute the fabricated words to the defamed plaintiff. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 512-13, 518-20 (1991). Merely using rhetorical devices or editorial paraphrases is not enough. *Id.*

Here, neither of the statements Couch identifies can be fairly read as a quotation. The first supposedly fabricated quotation is: "Matt Couch 'was saying . . . [Joe Capone] was conspiring with Hillary Clinton.'" Couch Br. 17. But Isikoff didn't say those words in that way. Instead, Couch has selectively assembled phrases from questions Isikoff posed to Capone, in which Isikoff did little more than ask for clarification:

> Isikoff: What was Matt Couch saying was the significance of the fact that you had been to the White House on July 6?
>
> Capone: That there were secret meetings going on.
>
> Isikoff: Secret meetings with who?
>
> Capone: Hillary . . . You know . . .
>
> Isikoff: That you were conspiring with Hillary Clinton or?
>
> Capone: Must have been right?

11

JA 636-37 (emphasis omitted).

The second supposedly fabricated quotation is: "Matt Couch said 'a-ha, you see, why is Joe Capone going to the White House just a few days before Seth Rich's death? He must have been consulting with someone, aides to Hillary Clinton.'" JA 647, ¶ 106 (emphasis omitted). But the actual statement was much more vague:

> Matt Couch *and the Internet horde* discover this [that Capone had visited the White House] apparently from White House visitor logs. And they say, a-ha, you see, why is Joe Capone going to the White House just a few days before Seth Rich's death? He must have been consulting with somebody, aides to Hillary Clinton, and this somehow had something to do with Seth Rich's death.

JA 647, ¶ 105 (emphasis added).

At best for Couch's theory of the case, Isikoff is paraphrasing Couch, not misquoting him. At worst, Isikoff is paraphrasing Capone's paraphrase of Couch and using a rhetorical device to aggregate the theories of Couch and all the other online commentators in "the Internet horde." Neither option gives Couch the fabricated quotation he needs to show actual malice.

*Third*, Couch pivots to another theory of reckless disregard. He claims Isikoff behaved recklessly by stating that Couch accused Capone of engaging in a cover up of Rich's murder, with no more evidence than one or two "cryptic" tweets from Couch. Couch Br. 27. But in framing that argument, Couch gives away the game. As we've mentioned,

for reckless disregard Couch needs to show Isikoff knew of some obvious reason to have doubted the accuracy of the claim. *Lohrenz*, 350 F.3d at 1284. Those "cryptic" tweets (which Couch himself identified) ask why "Joe Capone" and "many people involved in and around the Seth Rich murder" "visit[ed] the White House." JA 497. The tweets also spoke of "corruption and cover up" in America. *Id.* This falls well short of evidence that would have given Isikoff serious doubts about the truth of his statement. *See Tah*, 991 F.3d at 240.

*Fourth*, and finally, Couch argues that actual malice can be inferred from Isikoff engaging in "[d]eceptive editorial juxtaposition." Couch Br. 30. By this, he means Isikoff maliciously insinuated that Couch harassed Mueller when Couch himself had nothing to do with the specific acts of harassment.

This argument also fails. The line Couch identifies as defamatory is from another back-and-forth where Mueller (not Isikoff) attributed the harassment to "trolls" "[l]ike Matt Couch." JA 639. Attaching a conclusory label to Isikoff's republication of that statement does nothing to prove either that Isikoff knew the falsity of the statement or had reason to doubt Mueller's veracity.

### C. Statements of Opinion Are Not Defamatory

We turn therefore to Couch's second category of supposed defamatory statements. Here, we find the six statements that are Isikoff's descriptions of Couch — that Isikoff called Couch an "Internet 'conspiracy entrepreneur,'" an "Internet troll," an "Internet crankster," an "Internet bully," a "member of the 'alt-right,'" and an "associate of a Southern 'confederate.'" JA 650-51.

The district court held that Couch lacked support to show that those six statements were made with actual malice. But in the alternative, it held that the six statements fail to even qualify as false because each statement is an opinion, not a verifiable fact. We agree with this alternative explanation and affirm the dismissal on that ground. *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2015).

For a statement to be defamatory, "it must at a minimum express or imply a verifiably false fact about" the defamed individual. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). A mere "statement of opinion" about a public figure "which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). So federal courts must dismiss defamation claims when the statements "cannot reasonably be interpreted as stating actual facts about an individual." *Weyrich*, 235 F.3d at 624 (cleaned up). We examine the statement "in context" when determining whether it expressed a verifiable fact or was merely "rhetorical hyperbole." *Id.*

None of the six statements in Couch's second category expresses or implies a verifiable fact. The same individual may be viewed as a "conspiracy entrepreneur" by one person and a hard-hitting investigative journalist by another, depending entirely on whether one agrees or disagrees with the asserted conspiracy. Such a subjective description cannot be proven to be true or false.

The same goes for "troll," "crankster," and "bully." While those terms are certainly pejorative and reflect Isikoff's distaste for Couch, they are merely subjective descriptors. True, a statement that an individual bullied someone else by engaging in specific acts of harassment carries factual connotations that

can be proven, or disproven, to a jury. But merely calling someone a bully is simply "imaginative expression." *Milkovich*, 497 U.S. at 17 (cleaned up).

Of the six statements, the closest to verifiable facts refer to Couch as a "member of the alt-right" and an associate of a Southern "confederate." But when read in proper context, those statements still fall short. While "member" can refer to membership in an organization, the "alt-right" is not a formal organization with defined parameters or for which membership is provable or disprovable. So that label is still "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt" Isikoff felt for Couch. *Id.* (cleaned up). And while Couch argues that "confederate" means Isikoff equated him with the southern Confederacy from the U.S. Civil War, the actual line from *Conspiracyland* was that Couch was "with one of his confederates named Josh" when discussing the Seth Rich murder. JA 107. In that context, "confederate" means nothing more than "accomplice" or "ally." *See* Confederate (noun, def. 2), *Merriam-Webster* (2024).

\* \* \*

Our analysis of the defamation claim need go no further than the conclusion that Couch failed to adequately plead defamation against Isikoff. While Couch also sued both Verizon and NPR, he lacks any independent claims against either Verizon or NPR. Verizon and NPR made no separate statements about Couch and merely published Isikoff's statements. Couch pleaded no facts that would have given either Verizon or NPR reason to doubt the credibility of Isikoff's reporting. *Lohrenz*, 350 F.3d at 1284. So the resolution of the defamation claim against Isikoff resolves the defamation claim against all other defendants as well.

As such, the district court properly granted judgment to all three defendants regarding defamation and properly denied leave to amend Couch's complaint for futility.

### III. Couch's Other Tort Claims Do Not Survive Independently

Couch also raised seven other tort claims against the defendants.[4] The district court determined that each of those other claims was "inherently tied to, or duplicative of," the primary defamation claim. *Couch*, 2021 WL 4476698, at *5. And because Couch failed to plausibly plead a defamation claim, all the derivative claims likewise failed. *Id.*

We agree. Because the actual malice standard effectively bars most defamation claims raised by public figures, plaintiffs often seek to repackage their claims into an alternative tort with a less demanding standard. But "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013). Each of Couch's derivative claims hinges on the allegedly defamatory speech — without the defamation they fail to plausibly state a claim for relief and must be dismissed. *See Khodorkovskaya v. Gay*, 5 F.4th 80, 84-85 (D.C. Cir. 2021); *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1287-88 (D.C. Cir. 2014).

---

[4] These were: (1) defamation per se; (2) intentional infliction of emotional distress; (3) false light; (4) intentional interference with business relations; (5) civil conspiracy for all alleged torts; (6) aiding and abetting for all alleged torts; and (7) negligent supervision and retention.

**IV. Conclusion**

Couch failed to plausibly state any claims against Isikoff, Verizon, and NPR. Eight of the supposedly defamatory statements lack any evidence that could prove actual malice, and the other six lack verifiable facts that could be proven or disproven to a jury. Because each of his other claims relied on the success of the defamation claim, they fail as well. And Couch's proposed amended complaint does not fix those problems.

We affirm the district court's dismissal for failure to state a claim as to Isikoff and Verizon, its grant of judgment on the pleadings as to NPR, its denial of leave for Couch to file an amended complaint, and its dismissal of the case with prejudice.[5]

*So ordered.*

---

[5] On appeal, Couch argued that the district court also erred by denying his motion for initial discovery into Verizon's corporate structure. But because we affirm the district court's disposition of the claims against Isikoff, Verizon, and NPR, there are no parties left against which Couch may seek discovery. Couch also indicated early on that he intended to challenge the propriety of dismissal with prejudice, but he later abandoned that argument. *See Levine/Schwab Partnership v. FCC*, 61 F.4th 183, 186 n.2 (D.C. Cir. 2023).